**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| WEST PUBLISHING CORPORATION,<br>610 Opperman Drive<br>Eagan, Minnesota 55123<br><br>        Plaintiff,<br><br>v.<br><br>DAVID VOGELGESANG<br>4007 Fairway Drive<br>Medina, Ohio 44256<br><br>and<br><br>PRICE POINT CONSULTING, LLC<br>4007 Fairway Drive<br>Medina, Ohio 44256,<br><br>        Defendants. | )<br>)<br>)<br>)  Civil Action No.:<br>)<br>)  Judge _____<br>)<br>)  Mag. Judge _____<br>)<br>)  (Demand for jury trial)<br>) |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff West Publishing Corporation, 610 Opperman Drive, Eagan, MN 55123 ("West"), for its Complaint for Injunctive and Other Relief against Defendants David Vogelgesang, 4007 Fairway Drive, Medina, OH 44256 ("Vogelgesang") and Price Point Consulting, LLC, 4007 Fairway Drive, Medina, OH 44256 ("Price Point"), states as follows:

## NATURE OF THE CASE

1.     This case stems from Vogelgesang's deliberate, unlawful and malicious misappropriation of trade secrets and other confidential information from his former employer, West, and his usage and disclosure of such trade secrets and confidential information on behalf of Price Point, a business owned and created by Vogelgesang.

2.     Vogelgesang's and Price Point's actions have caused and, unless enjoined by this Court, will continue to cause, immediate and irreparable harm and injury to West, its customer relationships, trade secrets, and confidential and proprietary information.  Accordingly, West asserts claims herein for misappropriation of trade secrets, violations of the federal Computer Fraud and Abuse Act, spoliation of evidence, tortious interference with contractual relationships, tortious interference with prospective business advantage, unjust enrichment, conversion, and for an accounting.

## PARTIES

3.     West is incorporated under the laws of the State of Minnesota and its principal place of business is located in Eagan, Minnesota.

4.     Vogelgesang is a citizen of the State of Ohio and resides within this judicial district in Medina, Ohio.

5.     Price Point is organized under the laws of Ohio and maintains its principal place of business in Ohio.  On information and belief, Vogelgesang is the sole officer, director and member of Price Point.

## VENUE

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Vogelgesang and Price Point reside within this district and because a substantial part of the events or

omissions giving rise to West's claims against Vogelgesang and Price Point occurred in this district.

## JURISDICTION

7.     The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 in that one of West's claims arises under federal law, and all other claims are so related to such federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

8.     Alternatively, the court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that there is diversity of citizenship between the parties and the matter in controversy exceeds $75,000 in value, exclusive of interest and costs.

## FACTS

### Background Regarding West

9.     West is a leading provider of legal information services throughout the United States.  Among other things, it publishes a vast array of legal books, treatises, and other publications, and also provides the online legal research service known as Westlaw.

10.     From each of its offices, West engages in interstate commerce and interstate communications.

### West's Confidential Pricing Information

11.     With respect to Westlaw, West maintains a confidential pricing grid that sets prices for access to certain databases at a rate per attorney.  West does not reveal this pricing grid to its customers.  Virtually every West customer purchases a customized package from West for access to Federal, state and local content that is tailored to meet specific customer-driven needs.

Under such customized packages, access to particular databases is typically priced at a set amount per month, with access to additional databases available on a fee-per-use basis.

12.    The vast majority of Westlaw customers also purchase printed legal publications and updates from West.  Because West has thousands of publications, it is extremely unlikely that any two customers purchase exactly the same West publications and updates.

13.    West offers packages of Westlaw services and printed materials, and provides customers bundled pricing for ordering both Westlaw and printed materials.  West's bundled contracts for Westlaw and print materials generally run for multiple years.

14.    West's Field Sales Representatives are authorized to offer certain discounts under certain circumstances, and West's Regional Sales Managers have discretion to offer a limited number of additional discounts under certain circumstances when requested to do so by a West Field Sales Representative.

15.    Because virtually every West customer purchases a unique set of goods and services, "apples to apples" comparisons of contracts for different West customers are not possible.  Although West shares with its customers information regarding account specific pricing and usage, West does not reveal to its customers information about third party usage and billing or West's master discounting strategy.   Rather, West's pricing and discounting information (hereafter, "West's Confidential Pricing Information") remains highly confidential.

### West's Confidential Customer Information

16.    In conjunction with its business development efforts and its efforts to best meet the needs of its customers, West has invested and continues to invest substantial time and money developing and compiling confidential and proprietary information regarding its customers.  This

confidential and proprietary customer information (hereafter, "West's Confidential Customer Information") includes, but is not limited to:

- identification of West's largest and most profitable accounts;

- account renewal dates (*e.g.*, the start and finish dates of customer contracts);

- the identity of specific client contacts and contact information for such persons;

- current amounts spent by customers for specific on-line and print products;

- and database utilization (*e.g.*, which specific attorneys within a given customer accessed which West databases).

## West's Confidential Pricing Information and West's Confidential Customer Information Constitute Trade Secrets

17.    West's Confidential Pricing Information and West's Confidential Customer Information are not generally known in the industry in which West competes and are only available from West's customer records or West employees who obtain access to such information through their employment with West.  Such information provides a distinct and invaluable advantage to West over competitors that do not have such information.  Other persons could achieve significant economic gain from the disclosure or use of West's Confidential Pricing Information and West's Confidential Customer Information.

18.    West's Confidential Pricing Information and West's Confidential Customer Information are both subject to reasonable efforts to maintain their secrecy.

19.    Thomson Reuters PLC (hereafter, "Thomson") is the ultimate parent corporation of West.  Thomson maintains a Code of Business Conduct and Ethics which was updated in January 2007.  The version of Thomson's Code of Business Conduct and Ethics that was updated in January 2007 (hereafter, the "Code of Business Conduct and Ethics") remained in effect

through February 2008, and it was posted on the internal website for all West employees from January 2007 through February 2008. A true and correct copy of certain excerpts from the Code of Business Conduct and Ethics are attached hereto as Exhibit A.

20. West maintains its human resources data and many of its personnel records electronically, using a software program known as PeopleSoft (hereafter, "West's PeopleSoft System").

21. Periodically, West requires all employees to electronically acknowledge their receipt of, and agreement to, the Code of Business Conduct and Ethics. In the ordinary course of its business, West maintains proof of such electronic acknowledgements through West's PeopleSoft System.

22. On January 30, 2007, Vogelgesang electronically acknowledged his receipt of, and agreement to, the Code of Business Conduct and Ethics.

23. The Code of Business Conduct and Ethics contains a Confidential Information Policy. In pertinent part, that policy (included as part of Exhibit A hereto) states as follows:

> As part of your job or position, you may learn or have access to confidential or nonpublic information relating to Thomson businesses, operations or technology. You should not share confidential information with anyone, including individuals within Thomson, unless there is a legitimate "need-to-know" and you are authorized to do so. Improper disclosure of confidential information could put us at a competitive disadvantage or could hurt or embarrass the company or other employees.
>
> **Examples of confidential information** – Confidential information includes some of our most valuable assets, such as the following examples:
>
> - Trade secrets,
> - Pricing policies and information,
> - Business or strategic operating plans and outlooks,
> - Nonpublic financial information about Thomson or our customers,
> - New product and brand developments, plans or forecasts,

- Customer lists, specifications and preferences,
- Contracts and agreements,
- Subscription lists

\*     \*     \*

Your obligation to safeguard the company's nonpublic information or other confidential information applies to you even after you leave the company for as long as the information remains confidential and is not generally available to the public.

Ex. A, at 8.

24.     West requires that its sales persons and sales managers take various on-line courses, such as a course in sales ethics and a course on the Code of Business Conduct and Ethics. West maintains records of employee attendance at, and successful completion of, such courses on West's PeopleSoft System.

25.     On January 8, 2007, Vogelgesang successfully completed West's on-line sales ethics course and on November 7, 2005 Vogelgesang successfully completed West's on-line Code of Business Conduct and Ethics course.

26.     Attached hereto as Exhibit B are true and correct excerpts from the on-line sales ethics course completed by Vogelgesang on January 8, 2007. Among other things, this on-line sales ethics course stated as follows: "If you're planning on leaving Thomson for another company, or looking to start your own business venture, don't take Thomson information with you." As examples of confidential business information, this on-line sales ethics course listed, among other things, "Customer lists, specifications and preferences" and "Pricing information and policies."

27.     Access to West's Confidential Pricing Information and West's Confidential Customer Information is strictly limited to those West employees with a need for access to such information.

28.     With respect to West's Confidential Customer Information, it is maintained on a password-protected network, and Regional Sales Managers and Field Sales Representatives are only provided such information for their own regions and territories.  Other than persons responsible for compiling and distributing West's Confidential Customer Information, non-sales personnel are not provided access to West's Confidential Customer Information.

29.     With respect to West's Confidential Pricing Information, only sales and finance personnel are provided access to this information.  Pricing and discounting arrangements for a particular client are shared only with finance personnel, management and the Field Sales Representative for that client; no other individuals are permitted access to this information.

**Vogelgesang's Employment with West and His Receipt of West's Trade Secrets**

30.     West hired Vogelgesang in 1996 as a Sales Representative.  In or about January 2000, Vogelgesang became a Regional Sales Manager for West.  From that time through the end of 2007, he held a variety of sales management positions with West.  In each of these sales management positions, Vogelgesang had access to West's Confidential Pricing Information and West's Confidential Customer Information.

31.     Effective as of January 1, 2008, Vogelgesang became a Director of Field Management at West.  In this position, he was responsible for managing West's sales operations in 16 states in the central portion of the United States.  In this position, Vogelgesang had access to West's Confidential Pricing Information and West's Confidential Customer Information.

32.     During Vogelgesang's employment with West, West provided him with a portable laptop computer for use in performing his duties for West.  At all times relevant hereto, the laptop computer and its contents were the property of West.

33.     In the course of his employment with West, Vogelgesang engaged in interstate travel to perform duties for West.  On one or more of his interstate trips, Vogelgesang traveled with his West-issued laptop computer and used it in the performance of his duties for West to engage in interstate communications.

34.     During the course of his employment with West, Vogelgesang regularly used his West-issued laptop computer to access, receive and store West's Confidential Pricing Information and West's Confidential Customer Information, via intra and inter-state communications.

35.     During the course of his employment with West, Vogelgesang used his West-issued laptop computer to e-mail and distribute, via intra and inter-state communications, West's Confidential Pricing Information and West's Confidential Customer Information to sales personnel who reported to him.

**Vogelgesang's Termination by West and
Failure To His Return His West-Issued Laptop**

36.     Vogelgesang was terminated by West, effective as of February 27, 2008, because of his improper response to allegations of fraudulent activity brought to his attention by a Regional Sales Manager.  West's internal investigation of these allegations identified improper activities by Vogelgesang that included a directive to that Regional Sales Manager that he not report the matter in question to human resources or the audit department of West.

37.     Vogelgesang was informed of his termination by West during a February 26, 2008 meeting conducted by Ann Ross ("Ross"), Director, Human Resources for West, and Sue Stubbs, West's Vice President, Sales and Account Management, Small Law Firm Channel. Sara Birmingham, West's Senior Director, Human Resources for sales and account management employees, also participated in this termination meeting by telephone.  During this February 26,

2008 meeting, Ross told Vogelgesang to immediately return his West-issued laptop computer and all other West property in his possession. Vogelgesang said nothing in response, and he gave no indication that his West-issued laptop computer was damaged in any respect.

38. On February 26, 2008, Ross sent Vogelgesang a letter dated February 26, 2008, along with a document entitled "Termination of Employment Information" and a document entitled "Termination of Employment Information – David Vogelgesang" by United Parcel Service next day delivery (hereafter, collectively, the "February 26, 2008 Vogelgesang Package"). A true and correct copy of the February 26, 2008 Vogelgesang Package is attached hereto as Exhibit C. A true and correct copy of an e-mail from United Parcel Service confirming the shipment of the February 26, 2008 Vogelgesang Package and providing a tracking number for it, is attached hereto as Exhibit D.

39. The document entitled "Termination of Employment Information" directed Vogelgesang to return "all corporate property," including "[a]ny written or electronic files made or compiled by you or made available to you concerning Thomson West business."

40. Similarly, the document entitled "Termination of Employment Information – David Vogelgesang" states, in pertinent part, "We will need your laptop, blackberry and any other company property. Please ship this to STS immediately. . . . If you have any questions following this meeting, please call Ann Ross at 651-687-1783."

41. The February 26, 2008 Vogelgesang Package was not returned as undeliverable, and West is not aware of any difficulty associated with the delivery of it.

42. According to the tracking summary for the February 26, 2008 Vogelgesang Package (Exhibit E hereto), the package was delivered to Vogelgesang on February 27, 2008 at 10:12 a.m.

43.     Ross has had no verbal or written communications with Vogelgesang since February 26, 2008.

44.     In pertinent part, the Code of Business Conduct and Ethics states, "Company assets are highly valuable and are meant for business use." Ex. A, at 4. The Code of Business Conduct and Ethics provides examples of company assets, and lists such items as computer equipment, customer lists and information, and other documents (whether in paper or electronic format) that relate to the company's business. Ex. A, at 4. Further, the Code of Business Conduct and Ethics states, "If you leave the company, or upon the company's request, you must return any and all company assets in your possession to Thomson." Ex. A, at 4.

45.     In the ordinary course of business, managers in West's sales organization, such as Vogelgesang, attend termination meetings of employees who report to them. It is part of West's customary business practice for a manager at such a termination meeting to either request the return of a West-issued laptop computer at the termination meeting, or to request its immediate return thereafter.

46.     On information and belief, Vogelgesang attended many termination meetings of employees who reported to him, during which the terminated employee was either requested to return the West-issued laptop computer at the termination meeting, or requested to return it immediately thereafter.

47.     Notwithstanding the oral directive given him on February 26, 2008, the subsequent written directive delivered to him on February 27, 2008, the provisions of the Code of Business Conduct and Ethics referenced herein and agreed to previously by him, and past-practice during the termination meetings he attended, Vogelgesang did not return his West-issued laptop computer or any other West property in his possession until a demand letter was

sent by West to his attorney on April 17, 2008 (hereafter, "West's April 17, 2008 Demand Letter"). A true and correct copy of West's April 17, 2008 Demand Letter is attached hereto as Exhibit F.

48.    In response to West's April 17, 2008 Demand Letter, Vogelgesang – by and through outside counsel on his behalf – contended in an April 21, 2008 letter ("Vogelgesang's April 28, 2008 Response Letter") that he was never given instructions as to how to return the West-issued laptop computer and other West property, and he denies receiving the written directive delivered to his home on February 27, 2008. A true and correct copy of Vogelgesang's April 21, 2008 Response Letter is attached hereto as Exhibit G.

### Vogelgesang's Creation of Price Point

49.    On or about March 19, 2008, Vogelgesang formed a new company, co-defendant Price Point. At or around that date, Vogelgesang launched a website for Price Point, located at http://pricepointconsulting.com.

50.    As of May 5, 2008, the "Home Page" section of Price Point's website stated, in pertinent part, as follows:

> Price Point Consulting, LLC is a unique results oriented consulting firm servicing the Legal Community. The company was created for the sole purpose of helping consumers of Legal Research Materials reduce the cost of their Legal Research Libraries. The founder of Price Point Consulting spent the past 12 years working for the "Big Publisher" in sales and sales management roles. During those 12 years the founder has negotiated thousands of contracts for the benefit of the "Big Publisher" and now wants to put that experience to work for your Firm to get your rates lowered for print materials, on-line services, or both.
>
> Our goal is to make quality Legal Research Materials available to you at affordable rates. We have the experience to achieve that goal and our motto is "If you don't save you don't pay".

Find out if your organization is over paying for your current on-line materials by contacting us today. We provide personal service and we have in depth knowledge of both publisher's products and services.

If you think the cost of Legal Research is out of control for your firm give us a call or send an email and let us see what we can do for you.

51.     As of May 5, 2008, the "About Us" section of Price Point's website stated, in pertinent part, as follows:

For over twelve years, the Founder of Price Point Consulting has been negotiating on-line legal research contracts on behalf of the Publishing Industry. With the cost of on-line services rising at 10% to 20% annually, put our experience in your corner. At Price Point Consulting we understand the lists of complex plans, the databases included in those plans, as well as the complicated pricing schemes that the Legal Publishers use to get you to spend more than you need or want. When you use our services you will know exactly what you are buying and we promise that your Firm will receive the right Legal Research content at the right price.

Our promise is simple, if we cannot save you money on your legal research services we don't get paid. Contact us today to lower your on-line legal research rates by as much as 40%. Call or write today to see if you are paying too much.

52.     As of May 5, 2008, the "Services" section of Price Point's website stated, in pertinent part, as follows:

We provide On-Line and Print Library consulting services to Law Firms, Corporate Legal Departments, Federal, State & Local Governments as well as Law Schools and County Law Libraries. Our goal is to lower your total cost of Legal Research Services without reducing content. If we cannot save you money you do not pay for our services but at least know you have the best possible price for what you receive.

- Lower your Library costs

- Reduce or eliminate your Ancillary Charges

- Lower annual price increases

- No more wasted time with Sales Representatives

- Forget about high pressure sales tactics Publishing Companies use

- Twelve Years of Experience in negotiating Legal Research Contracts

- No risk*if you do not save*we do not get paid

- Peace of mind knowing you have the best deal

- We want to help you get the most for less

## Vogelgesang's Trade Secret Misappropriation

53.     On information and belief, on or about March 20, 2008, Vogelgesang began contacting West customers whose contracts with West were up for renewal and informing them that he knew their contracts with West were up for renewal.  Vogelgesang further indicated that he could help them to secure better pricing from West.

54.     The law firm Petersen & Ibold, located in Chardon, Ohio, has a contract with West for Westlaw and for updates to various legal publications published by West. Petersen & Ibold's contract with West is scheduled to expire at the end of 2008.  Petersen & Ibold is currently in discussions with West to renew its contract.

55.     On March 20, 2008, Vogelgesang e-mailed Casey O'Brien, a partner in Petersen & Ibold, who is the law firm's liaison to West.  In that e-mail, Vogelgesang stated as follows:

> Casey,
>
> I would like to reintroduce myself to you and the Firm, [sic] for the past 12 years I have been working with Thomson/West in both sales and management roles selling Westlaw to Law Firms similar to yours.  I recently started a Consulting business to help firms lower their rates for on-line legal research services [sic] because your account will be coming up for renewal now may be a good time for us to meet regarding your on-line contract.

Please take a look at my Website and get back to me if you are interested if [sic] seeing if you are getting the best pricing for your firm. The web address is www.pricepointconsulting.com

I look forward to hearing from you.

Respectfully,

David Vogelgesang
Price Point Consulting, LLC
330 416-6262

A true and correct copy of the above-described e-mail is attached hereto as Exhibit H.

56.     Between March 20, 2008 and April 21, 2008, someone who identified himself as David Vogelgesang left Casey O'Brien 3 or 4 voice mail messages on his work voice mail. In one or more of these messages, Vogelgesang stated that he knew that Petersen & Ibold's contract with West Publishing was up for renewal and that "he could help us get a better deal."

57.     Prior to March 20, 2008, Casey O'Brien had never met or spoken to anyone named David Vogelgesang.

58.     On information and belief, no one from Petersen & Ibold told David Vogelgesang that Petersen & Ibold's contract with West Publishing was up for renewal, and Casey O'Brien does not know how Vogelgesang obtained this information, as it is not public information.

59.     On information and belief, Vogelgesang learned that Casey O'Brien is the liaison between Petersen & Ibold and West, and that Petersen & Ibold's contract with West is up for renewal, by misappropriating West's Confidential Customer Information.

60.     On Monday, April 14, 2008, Vogelgesang called Sherry Otto, the Director of Operations for the law firm Feiwell & Hannoy, PC in Indianapolis, Indiana. Otto serves as the liaison between West and her firm. During their April 14, 2008 telephone call, Vogelgesang told Otto that he had 12 years of experience with West, that he understood that Feiwell &

Hannoy's contract with West was coming up for renewal, and that, based on his experience with West, he believed that he could "negotiate a better contract" for Feiwell & Hannoy.

61.     Because Otto had neither spoken with, nor been aware of, Vogelgesang prior to April 14, 2008, she asked Vogelgesang during their April 14, 2008 telephone call, "Did you steal a customer list in order to get my name?" Vogelgesang did not respond to Otto's question. Accordingly, Otto then said, "I would really like to know if you stole a customer list in order to get my name." In response, Vogelgesang said, "No. I just took copious notes."

62.     On information and belief, Vogelgesang and/or Price Point have used and disclosed, and continue to use and disclose, West's Confidential Pricing Information and West's Confidential Customer Information without the express or implied consent of West.

63.     On information and belief, Vogelgesang and/or Price Point have used and disclosed, and continue to use and disclose, West's Confidential Pricing Information and West's Confidential Customer Information with knowledge that such information has been obtained in clear violation of Vogelgesang's duty under the Code of Business Conduct and Ethics to maintain its secrecy and not to use or disclose it.

64.     Based on the stated and demonstrated nature and goal of the business activities conducted, and to be conducted, by Vogelgesang through Price Point, further usage and disclosure of West's Confidential Pricing Information and West's Confidential Customer Information is inevitable.

### West's Discovery of Vogelgesang's Misappropriation
### of Trade Secrets, and Vogelgesang's Refusal to Stop His Misappropriation

65.     On or about April 10, 2008, West's Human Resources' personnel were informed that Vogelgesang had been calling West customers with specific information about their accounts up for renewal and how he can save them money.

66.     Following a preliminary initial investigation, on April 17, 2008, one of West's attorneys, Peter A. Steinmeyer, sent West's April 17, 2008 Demand Letter to Vogelgesang's attorney, Darlene Vorachek, and directed Vogelgesang to:

- return any and all West property in his possession or under his control;

- immediately cease and desist from using or disseminating any West trade secrets or confidential information; and,

- provide a sworn affidavit identifying:

    o all West trade secrets or confidential information that have been in his possession at any time since his termination;

    o all West trade secrets or confidential information that are presently in his possession, including a description of all media containing such trade secrets or confidential information;

    o all persons or organizations to which he directly or indirectly provided or offered to provide any West trade secrets or confidential information; and,

    o every direct or indirect usage by him of West trade secrets or confidential information since his termination.

67.     In Vogelgesang's April 21, 2008 Response Letter, Attorney Vorachek refused to provide any of the information requested by West, but nevertheless admitted that "Vogelgesang is offering to assist companies in negotiating for legal research services."

68.     As of the date of this Complaint, Vogelgesang has not provided any of the information that West requested in its letter of April 17, 2008, nor has he agreed to stop his misappropriation of West's Confidential Pricing Information and West's Confidential Customer Information.

**Vogelgesang's Destruction Of His West-Issued Laptop Computer In An
Apparent Effort To Conceal His Post-Termination Access To West's
Confidential Pricing Information And West's Confidential Customer Information**

69.     In pertinent part, West's April 17, 2008 Demand Letter also states as follows:

> Mr. Vogelgesang is hereby given notice not to destroy, conceal or
> alter any paper and/or electronic files, including "deleted" files and
> file fragments, and/or other data generated by and/or stored on any
> computers and/or storage media (*e.g.*, his Thomson-issued laptop
> and blackberry, hard disks, floppy disks, or backup tapes), or any
> other electronic data, such as voice mail, that in any way relates to
> the subject matter of this letter and/or the letter from Darlene A.
> Vorachek to Deirdre Stanley dated April 7, 2008.

70.     Vogelgesang returned his West-issued laptop computer by Federal Express delivery to West on Monday, April 21, 2008. There was no physical damage to the box containing Vogelgesang's West-issued laptop computer. However, the laptop itself had significant exterior and internal physical damage, such that neither West, nor an outside vendor that specializes in rebuilding physically damaged hard drives, was able to retrieve any data whatsoever from the laptop and/or its hard drive. Rather, there was such significant and extreme damage to the laptop, including the hard drive, that its hard drive and all data and documents contained thereon were rendered completely inaccessible.

71.     If the hard drive on Vogelgesang's West-issued laptop computer had not been rendered completely inaccessible by Vogelgesang, West would have been able to access all data and documents on Vogelgesang's West-issued laptop computer, and it would have been able to determine which of these data and documents had been accessed, modified, copied, or exported by Vogelgesang following his termination from West.

72.     On information and belief, between February 26, 2008 and April 21, 2008, Vogelgesang deliberately inflicted significant and extreme damage to his West-issued laptop

computer, including its hard drive, before returning it to West in an effort to hide his access to, and usage of, data and documents contained thereon following his termination from West.

## COUNT I

**MISAPPROPRIATION OF WEST'S TRADE SECRETS AND CONFIDENTIAL AND PROPRIETARY INFORMATION, IN VIOLATION OF THE OHIO UNIFORM TRADE SECRETS ACT (OHIO REV. CODE ANN.§ 1333.61. ET SEQ.)**

73.    West realleges and reasserts Paragraphs 1 through 72 as though fully set forth and restated herein.

74.    Section 1333.62 of the Ohio Uniform Trade Secrets Act ("OUTSA"), OHIO REV. CODE ANN. ("O.R.C.") § 1333.61 *et seq.*, authorizes the enjoinment of actual or threatened misappropriation of trade secrets. O.R.C. § 1333.62(A).

75.    Section 1333.61(D) of the OUTSA defines a "trade secret" as follows:

> "Trade Secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses or telephone numbers, that satisfies both of the following:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.R.C. §1333.61(D).

76.    West's Confidential Customer Information and West's Confidential Pricing Information constitute trade secrets under the OUTSA (hereafter, "West's Trade Secrets") because they are sufficiently secret to derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons

who can obtain economic value from their disclosure or use; and, they are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

77. During the course of his employment with West, Vogelgesang acquired knowledge of West's Trade Secrets.

78. West's Trade Secrets were acquired under circumstances giving rise to a duty by Vogelgesang to maintain their secrecy. West entrusted its Trade Secrets to Vogelgesang in the performance of his duties as a West employee.

79. As described above, Vogelgesang agreed, subject to the Code of Business Conduct and Ethics, that he would not improperly utilize or divulge West's Trade Secrets.

80. Section 1333.61(B) of the OUTSA defines "misappropriation" as follows:

"Misappropriation" means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

O.R.C. §1333.61(B).

81.     Vogelgesang's and/or Price Point's use of West's Trade Secrets to wrongfully and unfairly call upon, solicit, and induce customers and/or prospective customers of West whom Vogelgesang knowingly contacted and/or about whom Vogelgesang acquired confidential information or Trade Secrets during his employment with West, to the potential or actual detriment of West, is a misappropriation of West's Trade Secrets and/or a threat of misappropriation.

82.     Given the very nature and intent of Vogelgesang's and, by extension, Price Point's business, including the solicitation and acceptance of business from current West customers and/or prospective customers based on Vogelgesang's knowledge and willingness to use and/or disclose West's Confidential Pricing Information, there is a continued threat of misappropriation of West's Trade Secrets which West is entitled to enjoin.

83.     Vogelgesang's and/or Price Point's misappropriation of West's Trade Secrets was made in bad faith.

84.     On information and belief, Vogelgesang also misappropriated West's Trade Secrets by using and/or disclosing them in connection with his employment by Price Point.

85.     Section 1333.61(A) of the OUTSA defines "improper means" to include:

> theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

O.R.C. §1333.61(A).

86.     At the time that Vogelgesang improperly utilized, divulged or traded upon West's Trade Secrets as set forth above, and/or continues to improperly utilize, divulge or trade upon West's Trade Secrets, Vogelgesang had reason to know and/or knows that he owed a duty to West to maintain the secrecy and confidentiality of West's Trade Secrets.

87. At no time did West, or any other West employee, grant Vogelgesang and/or Price Point an express or implied consent to disclose or use West's Trade Secrets.

88. The wrongful acts described herein have proximately injured and impaired West, and continue to proximately injure and impair West.

89. As a direct and proximate result of the wrongful acts described above, West sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial losses in revenues, loss of profits, loss of goodwill, loss of business relations with existing and future business prospects and loss of competitive business advantage, opportunity and/or expectancy.

90. There is a substantial risk that Vogelgesang and/or Price Point will continue to irreparably injure West unless they are preliminarily and/or permanently enjoined. In particular, West's Trade Secrets that Vogelgesang intends to and inevitably will use – or, on information and belief, already has used – will allow Vogelgesang and Price Point to gain a substantial unfair competitive advantage over West. Unless enjoined, Vogelgesang will use, or continue to use, West's Trade Secrets on behalf of Price Point.

91. In the alternative, and/or in addition to the irreparable injury described above, as a direct and proximate result of the conduct described above, West has suffered and will continue to suffer actual and/or consequential damages in an amount that exceeds $75,000. West is entitled to recover such damages from Vogelgesang and Price Point.

92. Vogelgesang's and/or Price Point's misappropriation of West's Trade Secrets was knowing, intentional, willful, wanton and malicious and was taken with reckless disregard for the rights of West so as to warrant an award of punitive damages.

93.     Based on Vogelgesang's and/or Price Point's deliberate and surreptitious theft of West's Trade Secrets, and the inevitability that they will use – or continue to use – those trade secrets, simply enjoining them from violating the OUTSA is not a sufficient remedy for these past and future violations.

**COUNT II**

**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**
**BY CAUSING DAMAGE TO WEST-ISSUED LAPTOP**

94.     West realleges and reasserts Paragraphs 1 through 93 as though fully set forth and restated herein.

95.     The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, provides, in relevant part, as follows:

> Whoever…(A)(ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damages; or (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and (B) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused…(i) loss to 1 or more persons during any 1-year period…aggregating at least $5,000 in value…shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030(a)(5).

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.  A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B).  Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages….

18 U.S.C. § 1030(g).

> [T]he term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

18 U.S.C. § 1030(e)(8).

96.     Vogelgesang's West-issued laptop computer is a "protected computer" as defined by the CFAA.

97.     On information and belief, between February 26, 2008 and April 21, 2008, Vogelgesang and/or Price Point intentionally accessed Vogelgesang's West-issued laptop computer without authorization and thereby obtained information from it, some of which was received through an interstate communication, which he then used in interstate communications, thus violating 18 U.S.C. § 1030(a)(2)(C).

98.     On information and belief, between February 26, 2008 and April 21, 2008, Vogelgesang and/or Price Point deliberately inflicted significant and extreme damage to Vogelgesang's West-issued laptop computer, including its hard drive, before returning it to West in an effort to hide Vogelgesang's access to, and usage of, data and documents contained thereon following his termination from West.

99.     By deliberately inflicting significant and extreme damage to Vogelgesang's West-issued laptop computer, including its hard drive, Vogelgesang and/or Price Point intentionally accessed Vogelgesang's West-issued laptop computer without authorization for the purpose of destroying and/or preventing access to data files belonging to West, and did thereby cause damage to West by impairing the integrity or availability of data or information, thus violating 18 U.S.C. § 1030(a)(5)(A)(ii) and/or (iii).

100.    Vogelgesang's and/or Price Point's conduct has forced West to incur costs in excess of $5,000 in responding to their offense and conducting a damage assessment.  Therefore, Vogelgesang's and/or Price Point's conduct is actionable pursuant to 18 U.S.C. § 1030(g) and § 1030(a)(5)(B)(i).

## COUNT III

## SPOLIATION OF EVIDENCE

101.    West realleges and reasserts Paragraphs 1 through 100 as though fully set forth and restated herein.

102.    On information and belief, between February 26, 2008 and April 21, 2008, Vogelgesang and/or Price Point deliberately inflicted significant and extreme damage to Vogelgesang's West-issued laptop computer, including its hard drive, before returning it to West in an effort to hide Vogelgesang's access to, and usage of, data and documents contained thereon following his termination from West.

103.    On information and belief, as of the time Vogelgesang and/or Price Point deliberately inflicted significant and extreme damage to Vogelgesang's West-issued laptop computer, including its hard drive, Vogelgesang and Price Point knew that litigation between them and West was probable, and the damage to Vogelgesang's West-issued laptop computer was designed to disrupt West's case in litigation with Vogelgesang and/or Price Point.

104.    Vogelgesang's and/or Price Point's infliction of significant and extreme damage to Vogelgesang's West-issued laptop computer, including its hard drive, has disrupted West's case against them in that West is no longer able to review Vogelgesang's access to, and usage of, data and documents contained on the hard drive on his West-issued laptop computer following his termination from West.

105.    West has been harmed by Vogelgesang's and/or Price Point's infliction of significant and extreme damages to Vogelgesang's West-issued laptop computer, including its hard drive, in that its case against Vogelgesang and/or Price Point has been weakened and West is no longer able to review Vogelgesang's access to, and usage of, data and documents contained

on the hard drive on Vogelgesang's West-issued laptop computer following his termination from West.

## COUNT IV

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

106. West realleges and reasserts Paragraphs 1 through 105 as though fully set forth and restated herein.

107. Under the terms of his employment with West, including, but not limited to, adherence to the Code of Business Conduct and Ethics, Vogelgesang owed West a duty not to interfere with West's contractual relationships with West customers and not to use West's Confidential Customer Information and/or West's Confidential Pricing Information to his advantage and to West's detriment by inducing any current or prospective West customer to alter and/or discontinue an existing business relationship with West as a result of Vogelgesang's or Price Point's improper use of West's Confidential Customer Information and/or West's Confidential Pricing Information.

108. Vogelgesang knew of the Code of Business Conduct and Ethics, and the confidential and proprietary nature of West's Confidential Pricing Information and/or West's Confidential Customer Information.

109. Vogelgesang and/or Price Point have unlawfully, intentionally, and willfully interfered with West's existing agreements with West customers by using West's Confidential Customer Information and/or West's Confidential Pricing Information to their advantage and to West's detriment by inducing and/or attempting to induce any current or prospective West customer to alter or discontinue an existing business relationship with West as a result of Vogelgesang's or Price Point's improper use of West's Confidential Customer Information and West's Confidential Pricing Information.

110.    Vogelgesang's and/or Price Point's attempted and/or actual interference with and inducement of West customers to alter and/or discontinue their relationship with West has caused, or will continue to case, irreparable harm to West, including loss of competitive advantage and loss of customer goodwill.

111.    To the extent that West's Confidential Customer Information and West's Confidential Pricing Information are not trade secrets for purposes of the OUTSA, Vogelgesang and Price Point have tortiously interfered with West's contractual relationships.

112.    West has suffered damages in an amount to be determined at trial as a direct and proximate result of Vogelgesang's and/or Price Point's interference with and inducement of West's customers.

## COUNT V

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

113.    West realleges and reasserts Paragraphs 1 through 112 as though fully set forth and restated herein.

114.    West has a reasonable expectation of a valid business relationship with customers in the legal information services industry, as described above. This expectation is based, in great part, on the extensive amount of time, energy, resources and personnel it takes to develop customer relations and customer goodwill, and to compile proprietary information such as West's Confidential Pricing Information and/or West's Confidential Customer Information.

115.    Vogelgesang and Price Point were aware of this prospective economic business advantage, opportunity, and/or expectation of West.

116.    As detailed above, Vogelgesang and/or Price Point intentionally and/or purposefully prevented West's business expectancy from ripening by unlawfully interfering and/or attempting to interfere with West's economic business advantage.

117. Vogelgesang and/or Price Point wrongly interfered with West's business expectancy by inducing and/or attempting to induce West's customers to conduct business with Vogelgesang and Price Point through, among other things, improperly soliciting West's customers and/or prospective customers in violation of his obligations to West.

118. Vogelgesang conducted these improper solicitations with actual knowledge that he was in violation of his obligations to West, and by improperly using West's Confidential Pricing Information and/or West's Confidential Customer Information, and by wrongly soliciting and/or accepting business from West's customers and prospective customers.

119. These wrongful acts of interference described above proximately injured and/or are likely to impair West's prospective economic business advantage, opportunity and/or expectancy.

120. As a direct and proximate result of the wrongful, improper and intentional acts described herein, West has sustained and/or will sustain immediate and irreparable harm and injury, including, but not limited to, losses in revenues, loss of profits, loss of customer goodwill, loss of business relations with existing and future business prospects, and loss of competitive business advantage, opportunity and/or expectancy.

121. To the extent that West's Confidential Customer Information and West's Confidential Pricing Information are not trade secrets for purposes of the OUTSA, Vogelgesang and Price Point have tortiously interfered with West's contractual relationships.

122. There is a substantial risk that Vogelgesang and/or Price Point will continue to tortiously interfere with West's prospective economic business advantage, opportunity and/or expectancy unless Vogelgesang and Price Point are preliminarily and/or permanently enjoined.

123. West has no adequate remedy at law.

124.    The actions of Vogelgesang and Price Point were willful, intentional, malicious, vexatious, done in direct disregard of West's rights, and done with the specific malicious intent to cause harm to the interests and economic well being of West.

## COUNT VI

## CONVERSION

125.    West realleges and reasserts Paragraphs 1 through 124 as though fully set forth and restated herein.

126.    West entrusted Vogelgesang with its property, including, but not limited to, West's Confidential Pricing Information and West's Confidential Customer Information.

127.    West has an absolute and unconditional right to the immediate possession of its property, including, but not limited to, West's Confidential Pricing Information and West's Confidential Customer Information, regardless of the form or medium in which they are contained.

128.    Neither Vogelgesang nor Price Point have any property rights or interest in any of West's property, including, but not limited to, West's Confidential Pricing Information and West's Confidential Customer Information.

129.    West made both oral and written demands for the return of any and all of its property in the possession of Vogelgesang on February 26, 2008 and February 27, 2008, respectively.

130.    On information and belief, Vogelgesang and/or Price Point continue to possess property of West, including, but not limited to, West's Confidential Pricing Information and West's Confidential Customer Information.

131.    To the extent that any of West's property that remains in Vogelgesang's and/or Price Point's possession, including, but not limited to, West's Confidential Pricing Information

and West's Confidential Customer Information, does not constitute a trade secret within the meaning of the OUTSA, Vogelgesang's and/or Price Point's continued retention of same constitutes actionable conversion.

132.    The actions of Vogelgesang and/or Price Point were willful, intentional, malicious, vexatious, done in direct disregard of West's rights, and done with the specific malicious intent to cause harm to the interests and economic well being of West.

**COUNT VII**

**UNJUST ENRICHMENT**

133.    West realleges and reasserts Paragraphs 1 through 132 as though fully set forth and restated herein.

134.    As described herein, West entrusted Vogelgesang with West's Confidential Pricing Information and West's Confidential Customer Information.

135.    As described above, Vogelgesang and/or Price Point converted and/or misappropriated West's Confidential Pricing Information and West's Confidential Customer Information.

136.    Neither Vogelgesang nor Price Point have ever compensated West for the use of West's Trade Secrets or other property, thus depriving West of the benefit of assets that it expended considerable time, energy, resources, money, and personnel to develop and compile.

137.    Vogelgesang and Price Point have received a benefit from the wrongful conduct described herein.

138.    West has been proximately damaged and continues to be proximately damaged as a result of Vogelgesang's and/or Price Point's actions.

139.     West would not have been damaged but for Vogelgesang's and/or Price Point's wrongful conduct, from which Vogelgesang and/or Price Point derived, and continue to derive, a substantial benefit.

140.     Vogelgesang and Price Point cannot provide justification for their wrongful conduct described above or for their subsequent enrichment.

141.     To the extent that West's Confidential Customer Information and West's Confidential Pricing Information are not trade secrets for purposes of the OUTSA, Vogelgesang and Price Point have been or will be unjustly enriched through their unauthorized usage and/or disclosure of such information.

142.     The actions of Vogelgesang and Price Point were willful, intentional, malicious, vexatious, done in direct disregard of West's rights, and done with the specific malicious intent to cause harm to the interests and economic well being of West.

**COUNT VIII**

**BREACH OF CONFIDENTIAL INFORMATION,
IN VIOLATION OF THE OHIO REVISED CODE ANNOTATED § 1333.81**
**(As To David Vogelgesang Only)**

143.     West realleges and reasserts Paragraphs 1 through 142 as though fully set forth and restated herein.

144.     Section 1333.81 of the Ohio Revised Code (Annotated), "Breach of confidence by employee", states as follows:

> No employee of another, who in the course and within the scope of his employment receives any confidential matter or information, shall knowingly, without the consent of his employer, furnish or disclose such matter or information to any person not privileged to acquire it.
>
> O.R.C. § 1333.81.

145.     During this course of his employment with West, Vogelgesang routinely received West's Confidential Pricing Information and West's Confidential Customer Information as part of his sales management responsibilities.  This information was designated by West as confidential at all times, and Vogelgesang was aware of its status as confidential and/or proprietary to West.

146.     In addition, under the Code of Business Conduct and Ethics, as detailed herein, Vogelgesang knowingly acknowledged and attested to his obligation as a West employee to not furnish or disclose any confidential and/or proprietary information, whether while employed by West or at any future time upon termination of his employment with West.

147.     Despite his obligation to protect such confidential and/or proprietary information, Vogelgesang willfully and wantonly furnished and/or disclosed West's Confidential Pricing Information and West's Confidential Customer Information to persons not privileged or authorized to acquire it, including, but not limited to, current and/or prospective customers of West.

148.     To the extent that any specific pieces of information, including, but not limited to, West's Confidential Pricing Information and West's Confidential Customer Information, do not constitute a "trade secret" within the meaning of OUTSA § 1333.61(D), Vogelgesang's "furnish[ing] or disclos[ing]" of West's confidential and/or proprietary information to persons not otherwise privileged to acquire it constitutes a breach of confidence and thus violates O.R.C. § 1333.81.

149.     Therefore, Vogelgesang has knowingly violated O.R.C. § 1333.81 by furnishing and/or disclosing confidential and/or proprietary information belonging to West to persons and entities not otherwise privileged to acquire this information.

**WHEREFORE**, West prays for judgment against David Vogelgesang and Price Point, LLC, as follows:

A.  For an order preliminarily and permanently enjoining and restraining Vogelgesang and Price Point from:

1.  Directly or indirectly soliciting, advising or doing business with any customers and/or prospective customers of West, for a period of three years, regarding the pricing of any goods or services offered by West;

2.  Directly or indirectly soliciting, advising or doing business with any customers and/or prospective customers of West, for a period of three years, regarding the pricing of any goods or services offered by any competitor of West to the extent that West's Confidential Pricing Information and/or West's Confidential Customer Information is used, applied, or relied on in any manner;

3.  Directly or indirectly using, disclosing, or disseminating West's Confidential Pricing Information and/or West's Confidential Customer Information;

4.  Engaging in acts that constitute a misappropriation of West's Trade Secrets, confidential and/or proprietary information and/or other property;

5.  Engaging in acts that constitute a tortious interference with West's customer relationships, prospective business advantages, opportunities, expectancies, and/or contracts;

B.  For an order directing Vogelgesang and Price Point to immediately return to West any and all materials containing or reflecting any West property, including, but not limited to, West's Confidential Pricing Information and West's Confidential

Customer Information (including, but not limited to, any such property contained or stored on computer media);

C.    For an award of actual damages, including prejudgment interest, against Vogelgesang and Price Point, jointly and severally, pursuant to O.R.C. § 1333.63(A), in an amount in excess of $75,000.00 to be determined at trial, to compensate West for Vogelgesang's and Price Point's misappropriation of trade secrets, plus exemplary damages pursuant to O.R.C. § 1333.63(B) in the amount of three times any damages awarded pursuant to O.R.C. § 1333.63(A);

D.    For an award of reasonable attorneys' fees and costs incurred in bringing this action pursuant to O.R.C. § 1333.64, and as allowed by law;

E.    For an award of actual damages, including prejudgment interest, against Vogelgesang and Price Point, jointly and severally, in an amount to be determined at trial to compensate West for the actual loss and damage caused by Vogelgesang's and/or Price Point's violations of the CFAA;

F.    For an award of reasonable attorneys' fees and costs incurred in this action, as an element of West's actual loss caused by Vogelgesang's and Price Point's violations of the CFAA, and as allowed by law;

G.    For an award of actual damages, including prejudgment interest, and punitive damages against Vogelgesang and Price Point, jointly and severally, in an amount to be determined at trial to compensate West for the harm caused by Vogelgesang's wrongful conversion;

H.    For an award of actual damages, including prejudgment interest, and punitive damages against Vogelgesang and Price Point, jointly and severally, in an amount

to be determined at trial, to compensate West for Vogelgesang's and Price Point's wrongfully gained benefit and enrichment at the expense of West;

I.      For an award of punitive damages against Vogelgesang and Price Point, jointly and severally, based on the willful and malicious conduct of Vogelgesang and Price Point;

J.      For an order precluding Vogelgesang and/or Price Point (including, but not limited to, any of its officers, directors, employees, agents, representatives or affiliates) from destroying, erasing or otherwise making unavailable any records or documents (including data or information maintained on any computer media) in the possession, custody or control of Vogelgesang and/or Price Point (including, but not limited to, any of its officers, directors, employees, agents, representatives or affiliates) which: (i) were obtained from or contain information derived from West's records or files (including any computer media); (ii) pertain to any West clients; or (iii) relate to any of the events alleged in this Complaint.

K.      For an order granting the parties leave to conduct immediate and expedited discovery in aid of the preliminary injunction proceedings.

L.      For an award of such other and further relief as this Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable as provided by Fed. R. Civ. P. 38(c).

Respectfully submitted,

WEST PUBLISHING CORPORATION

By:


/s/ Matthew T. Fitzsimmons
One of its Attorneys

Dated: May 7, 2008                    Respectfully submitted,

NICOLA, GUDBRANSON & COOPER, LLC

/s/ Matthew T. Fitzsimmons
Matthew T. Fitzsimmons (0013404)
James H. Grove (0040815)
R. Christopher Yingling (0066551)
Landmark Office Towers
Republic Building, Suite 1400
25 W. Prospect Avenue
Cleveland, Ohio 44115-1048
Phone: (216) 621-7227
Fax: (216) 621-3999
E-mail:      fitzsimmons@nicola.com


EPSTEIN BECKER & GREEN, PC

/s/ Peter A. Steinmeyer
Peter A. Steinmeyer (IL Bar # 6211874)
Corey Perman (IL Bar # 6294756)
Jake Schmidt (IL Bar # 6270569)
150 North Michigan Avenue, 35th Floor
Chicago, Illinois  60601-7553
Phone: (312) 499-1400
Fax: (312) 845-1998
E-mail: psteinmeyer@ebglaw.com

Attorneys for Plaintiff
West Publishing Corporation

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

WEST PUBLISHING CORPORATION,     )
                                           )
                   Plaintiff,  )
                                         )
                 vs.               )   Civil Action No.:
                                         )
DAVID VOGELGESANG and PRICE POINT  )
CONSULTING, LLC,                    )
                          Defendants.

**PLAINTIFF'S NOTIFICATION OF AFFILIATES – DISCLOSURE STATEMENT**

Pursuant to Fed. R. Civ. P. 7.1, Plaintiff West Publishing Corporation ("West") hereby states as follows: (i) Thomson Legal & Regulatory Inc. is the immediate parent corporation of West Publishing Corporation; (ii) Thomson Legal & Regulatory Inc. - which is not a publicly held corporation - owns 100% of West Publishing Corporation; (iii) Thomson Reuters PLC is the ultimate parent corporation of West Publishing Corporation; and (iv) Thomson Reuters PLC is a publicly held company.

WEST PUBLISHING CORPORATION

By:

/s/ Matthew T. Fitzsimmons
One of its Attorneys

Dated:  May 7, 2008

Respectfully submitted,

NICOLA, GUDBRANSON & COOPER, LLC

/s/ Matthew T. Fitzsimmons
Matthew T. Fitzsimmons (0013404)
James H. Grove (0040815)
R. Christopher Yingling (0066551)
Landmark Office Towers
Republic Building, Suite 1400
25 W. Prospect Avenue
Cleveland, Ohio 44115-1048
Phone: (216) 621-7227
Fax: (216) 621-3999
E-mail:      fitzsimmons@nicola.com


EPSTEIN BECKER & GREEN, PC

/s/ Peter A. Steinmeyer
Peter A. Steinmeyer (IL Bar # 6211874)
Corey Perman (IL Bar # 6294756)
Jake Schmidt (IL Bar # 6270569)
150 North Michigan Avenue, 35th Floor
Chicago, Illinois  60601-7553
Phone: (312) 499-1400
Fax: (312) 845-1998
E-mail: psteinmeyer@ebglaw.com

Attorneys for Plaintiff
West Publishing Corporation